UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DOUGLAS ANTREASSIAN,<br>d.b.a. MASS HYSTERIA<br>HAUNTED HEARSE TOURS,<br><br>Plaintiff,<br><br>v.<br><br>KEVIN R. HARVEY, LAURA<br>A. DETOMA, KIMBERLEY L.<br>DRISCOLL, REGINA FLYNN,<br>THOMAS H. FUREY, SARAH<br>M. HAYES, SCOTT A.<br>LACAVA, JOAN B. LOVELY,<br>JOSEPH A. O'KEEFE,<br>LEONARD F. O'LEARY, &<br>ARTHUR C. SARGENT, III,<br>IN THEIR OFFICIAL AND<br>PERSONAL CAPACITIES AS<br>THE CITY COUNCIL OF<br>SALEM, MASSACHUSETTS,<br><br>Defendants. | Civil Action No.<br><br> |

## COMPLAINT

Plaintiff Douglas Antreassian, a small business owner, brings this action against the City Council of Salem, Massachusetts, for its unlawful denial of a vehicle for hire license to plaintiff to conduct a whimsical historical tour business in the city. The City Council's

1



denial and continuing refusal to issue a license are premised on unlawful suppression of Mr. Antreassian's First Amendment rights and repeated denials of due process of law. The City Council's stated reasons to the contrary are pretextual, groundless, and a subterfuge for abuse of its licensing authority. Defendants have continued to stonewall plaintiff's efforts to meet the City Council's objections and have ultimately failed to act on plaintiff's revised submission in a timely manner. Consequently plaintiff respectfully asks this court for declaratory and injunctive relief, damages, costs, and attorneys' fees.

1. Plaintiff Douglas Antreassian, proprietor of Mass. Hysteria Haunted Hearse Tours, resides at 99 Westville Avenue, Caldwell, New Jersey, 07006. He maintains a temporary summer residence in Worcester, Massachusetts.

2. The eleven named Defendants comprise the elected body of the City Council of Salem, the offices of which are located at the Salem City Hall, 93 Washington Street, Salem, Massachusetts 01970. Plaintiff brings suit against defendants in their official and personal capacities.

## NATURE OF ACTION

3. Mr. Antreassian seeks declaratory and injunctive relief, damages, costs, and attorney fees for conduct of the City Council in violation of Mr. Antreassian's rights to due process and free expression. His action arises under 42 U.S.C. § 1983 and the First and Fourteenth Amendments of the United States Constitution.

## JURISDICTION AND VENUE

4.      Pursuant to 28 U.S.C. §§ 1331 and 1343, this court has jurisdiction over plaintiff's civil rights claims. Venue is proper under 28 U.S.C. § 1391. Personal jurisdiction is premised on defendants' presence and action in the Commonwealth.

## FACTS

5.      Douglas Antreassian is the thirty-two year old owner/proprietor of Mass. Hysteria Haunted Hearse Tours, a business venture that would conduct historical tours of Salem, Massachusetts in a restored hearse. Mr. Antreassian's wife Anita attends to the financial concerns of the business.

6.      Mr. Antreassian modeled his enterprise after the "Crypt Keeper" hearse tour of New York City that he took with his wife in August 1999. A frequent visitor to Salem for its annual "Haunted Happenings" Halloween celebrations, Mr. Antreassian believes that the city's unique history makes it an ideal location for a similar tour. On the very day he took the New York tour Mr. Antreassian consulted with his wife and decided that he would start a hearse tour company in Salem.

7.      Recent efforts to bring tourist revenues to Salem have placed particular emphasis on its famous seventeenth-century witch trials, cultivating a playfully macabre image of the city. To this end the City has officially adopted its "The Witch City"

nickname, which appears on police cars and local firehouses. In 1992, to commemorate the 300th anniversary of the witch hysteria, the City unveiled the Salem Witch Trials Memorial.

8. Private attractions in Salem that evince visitors' fascination with the local macabre include four "witch museums," the Salem Wax Museum of Witches and Seafarers, the Salem Witch Village, and the Dracula's Castle haunted house.

9. At present several businesses conduct tours of Salem touching upon the witch trials as well as Salem's rich maritime history and vintage architecture. Horse-drawn carriages, trolleys, amphibious "duck tour" vehicles, and pedicabs transport tourists around Salem.

10. Of the tour businesses presently in operation, only the Salem Trolley has anything close to a business office in Salem. The proprietors of the horse-drawn carriage and Moby Duck tours are not Salem residents.

11. In September 1999 Mr. Antreassian took the first steps toward realizing his vision. He borrowed over $60,000 from family and friends and invested upwards of $25,000 in the purchase and outfitting of a 1970 vintage Cadillac hearse to carry eight to ten passengers "vertically." Restoration of the hearse — a project that included the installation of a new engine, a new climate control system, seats in the rear, and a CD surround sound system — would take over six months to complete.

12. In the meantime Mr. Antreassian contacted Robert Cahill, a former sheriff of Essex County and author of over twenty books, most locally published, on the history of Salem and its environs. Excited by Mr. Antreassian's proposed project, Mr. Cahill came out

of retirement to compose a tour narrative for the Mass. Hysteria enterprise. Mr. Antreassian also tapped Mr. Cahill's expertise to develop a proper itinerary for his tour. Except for several minor edits, Mass. Hysteria's tour narrative was born entirely of Mr. Cahill's local authority on Salem.

13. To promote Mass. Hysteria Mr. Antreassian hired an experienced HTML programmer to develop a website at http://www.masshysteriatours.com. Although his official base of operations and domestic residence would remain in New Jersey temporarily, Mr. Antreassian activated a toll-free reservations line and established a post office box in Salem to receive written correspondence. The Antreassians planned a permanent move to Massachusetts once their business took hold.

14. In the winter and early spring Mr. Antreassian turned his attention to acquiring the licenses and permits necessary for legal conduct of his tour. He duly acquired a Massachusetts driver's license and insured and registered his hearse with the Commonwealth as a livery vehicle. He petitioned the City of Salem for a Tour Vehicle License, a Public Guide License and a Business Certificate; the City granted all three without comment.

15. Mr. Antreassian learned in March 2000 that § 44-2 of the Salem Code required him to apply for a fourth license from the City— a "vehicle for hire license." The ordinance professes to cover "vehicles conveying goods, wares and other articles," but textual nuance of the ordinance and the City's common practice have expanded its coverage to include tour vehicles.

5

16. This fourth licensing hurdle was unique in that the governing ordinance requires the City Council itself to decide on the application.

17. Assistant City Clerk Jan Corbett assured Mr. Antreassian that the Council routinely approves such applications, that the body would issue its decision between one month and six weeks after receipt of his submission, and that its review entailed nothing more than a basic police background check.

18. Mr. Antreassian promptly made application to the Council's Ordinances, Licenses and Legal Affairs Committee by filling out a form and submitting it to the City Clerk.

19. The Committee first addressed the application at its April 13, 2000 meeting, where Mr. Antreassian answered the routine questions of both on- and off-Committee Council members in attendance.

20. At the April 13 meeting Defendant Councilor Scott LaCava advised Mr. Antreassian that he would block the grant of a license unless Mr. Antreassian agreed not to apply any logo or design on his hearse that depicted a witch or any paranormal or supernatural figure. Mr. Antreassian, who had harbored no such intent in the first place, stipulated to this condition.

21. At the April 13 meeting Council members also asked Mr. Antreassian for assurance that the proceeds of the Commonwealth's excise tax on his car registration would go to the City of Salem. Mr. Antreassian responded that he expected this to be the case, as he had registered his car to his post office box address in Salem.

22.  At the April 13 meeting Defendant Councilor Regina Flynn professed a personal curiosity in the tour narrative Mr. Cahill had prepared for Mass. Hysteria. At her request Mr. Antreassian provided Ms. Flynn with a copy of the narrative. Defendant Councilor Kimberley Driscoll asked more formally for a copy of the script.

23.  Upon the Committee's demand Mr. Antreassian also submitted his tour itinerary first to the Council and later to the Salem Police Department. Defendant Councilor Leonard O'Leary moved to table the issue until its next meeting pending the Police Department's review of Mass. Hysteria's itinerary. The Committee promised to rule on Mr. Antreassian's license application at its May 3 meeting.

24.  At the Committee meeting on May 3, it immediately became clear that Defendant Driscoll had photocopied and distributed Mass. Hysteria's tour narrative to the entire City Council. Every member of the Council was in attendance, and the atmosphere was charged.

25.  As a result Mr. Antreassian found himself the object of what he regarded as an "ambush" led by Defendant Council President Kevin Harvey, a "guest" of the Committee. Mr. Harvey levied broad accusations against Mr. Antreassian, charging that he was "rude" and wanted only "to take advantage of the community" and "to make a fast buck." Mr. Harvey went on to declare that he was "personally offended" by the proposed tour script and its "disgusting subject matter."

26.  More specifically, Mr. Harvey informed Mr. Antreassian that the Council would not grant the vehicle for hire license unless he removed from his tour script any

7

reference to recent murders of two Salem residents. Mr. Harvey also found fault with several aspects of Mr. Antreassian's advertising brochures that he personally believed to be misleading. Mr. Harvey further objected to Mass. Hysteria's website, which he called "an embarrassment."

27. Defendant LaCava interjected his own criticisms of the website. He claimed that the script was "not respectful to the community," was "creating emotional distress," and was "making a buck off emotional distress."

28. Defendant Flynn lodged general objections to the content of the tour narrative.

29. Defendant Councilor Joan Lovely added that Mr. Antreassian had not listed a Salem business address on his application and expressed concern lest some customer should leave behind an article of clothing and not know where to look for it. Ms. Lovely also suggested that because Mr. Antreassian had no Salem business address, he could abscond with the credit card numbers of customers without ever giving the tours.

30. The fleet of Salem Trolleys, at approximately four times the length of Mass. Hysteria's hearse, presently makes thirteen street stops throughout the city on tours that depart as often as twelve times daily, during the peak period spanning mid-June and October. Notwithstanding this fact, Defendant Driscoll summarily concluded at the May 3 Committee meeting that there was not adequate space on city streets for Mr. Antreassian to move and park his vehicle.

31. Defendant Councilor Joseph O'Keefe objected to Mr. Antreassian's listing of "Mass. Hysteria Haunted Hearse Tours" on one license application and "Mass. Hysteria Tours" in a less accommodating space on the vehicle for hire form.

32. The Committee recommended that the Council deny Mr. Antreassian's application. On May 11 the Council voted unanimously to ratify that decision.

33. The City Clerk's notice of the Council's license denial cited the following reasons to support the license denial:

> 1. Inadequate and unsuitable parking and access for vehicle to be used for tours.
> 2. No specific location for conducting tour business and inconsistent address listed on application.
> 3. The granting of proposed license will constitute an unwanted intrusion into residential neighborhoods in the city.
> 4. The proposed vehicle for hire does not promote a positive public image of the city.

34. The ordinance gave no notice that any of the above considerations were material to the Council's licensing determinations. Nor did the ordinance list any of the concerns that individual Councilors raised at the meeting as valid grounds for denial of the vehicle for hire license.

35. The *Salem Evening News* reported that Defendant Flynn "was upset at the script" and had noted at the May 11 meeting that Mr. Antreassian's reference in the script to a recent murder "'breaks our hearts all over again.'" In the *Boston Globe* two weeks later Ms. Flynn narrowed her focus to the unpleasant associations of the hearse itself: "Nothing positive is associated with a hearse."

36. Defendant Harvey told the *Boston Globe* that the content of the script — and particularly its reference to the Brailsford and Lloyd murders — motivated his animus, and his vote, against Mr. Antreassian. Mr. Harvey promised that Mr. Antreassian would "be properly fined and shut down if he attempt[ed] to go against the will of this council . . . ." The City has threatened fines of up to $300 for every day Mr. Antreassian operates his tour without this fourth required license.

37. The Brailsford murder is a matter of significant public interest, a "compelling true crime story" that author Margaret Press recounted in her 1996 novel *Counterpoint: A Murder in Massachusetts Bay*. Nonetheless, in deference to the family, Mr. Antreassian agreed to redact from his script any reference to the murder.

38. During the May 3 meeting and for almost three months thereafter Mr. Antreassian has endeavored to settle the issues raised by City Council members. He has removed the references to the murders from his tour narrative.

39. He has confirmed to the Council that all excise taxes paid to the Commonwealth would go to Salem.

40. He has named Mr. Cahill his business representative, thereby establishing a Salem business address.

41. He has volunteered to post a bond with the City to protect consumers from losses.

42. He has arranged to begin his tour at a publicly designated tour stop in front of the Salem Visitor's Center. The Moby Duck and Salem Trolley tours presently assemble their passengers in this space.

43. Fooled once already, however, Mr. Antreassian attempted through counsel to acquire a deeper understanding of the unstated requirements of his license application. Assistant City Solicitor John Keenan stated in a June 10 letter that he "cannot and ha[s] not provided [Mr. Antreassian] with advice on what to include in his application." In a letter four days later Mr. Keenan echoed the soothing, if ultimately inaccurate, words of the Assistant Clerk two months earlier, offering only that the application requirements were "straightforward" and referring Mr. Antreassian to the text of the ordinance.

44. On June 16, Mr. Antreassian submitted a revised vehicle for hire license application at the Office of the City Clerk.

45. Although the Council listed the "Vehicle for Hire Application of Mass. Hysteria Haunted Hearse Tours" on the Agenda for its June 22, 2000 meeting, no action was taken at that meeting. Defendant Sarah Hayes, Chairperson of the Council's Ordinances, Licenses and Legal Affairs Committee, informed counsel for the plaintiff that the Committee will not review Mr. Antreassian's resubmitted application until its July 20 meeting.

46. At its July 20 meeting the Committee voted, on Councilor O'Leary's motion, to leave the matter in Committee. Effectively, after almost five months, a simple, ministerial license has been denied. The full Council has no scheduled August meeting, and

Mass. Hysteria therefore cannot operate as a licensed tour operation until mid-September at the earliest.

47.     The City Marshal has declined to issue a temporary (thirty-day) license to Mr. Antreassian while his revised submission to the Council is pending.

48.     As a result of the initial denial and the Council's continued delay in ruling upon Mr. Antreassian's amended submission, Mass. Hysteria has been forced to postpone indefinitely its launch date, originally slated for Memorial Day weekend. Clearly, the continuing delay is intended to foreclose any business opportunity Mr. Antreassian may have during the summer tourist season. This season is critical for successful operation of a tour business.

49.     Mr. Antreassian has been told also that the City plans to charge him a ten dollar fee for each entry of the hearse into Winter Island Park, a prominent public stop on Mass. Hysteria's tour itinerary. Mr. Antreassian has since learned that the privately-owned Salem Trolley, which stops at the Park hourly (and at half-hour intervals between mid-June and November), pays no entrance fee. Park officials have declined to comment on the source of and reasons for this new, apparently personally-targeted policy.

50.     Mr. Antreassian has cancelled a number of previously booked tours, incurring substantial charge-card penalties on top of six weeks' lost revenue. In an effort to recoup lost goodwill Mr. Antreassian has promised 20% discounts to cancelled customers. On a daily basis Mass. Hysteria turns away customers calling to book tours.

51. Unable to draw in any revenue to recoup its debts, Mass. Hysteria is in dire financial straits. The Council's actions to date evince an intent to wield its licensing powers against Mr. Antreassian until he can no longer sustain his business.

## COUNT I

52. Mr. Antreassian repeats and realleges each and every allegation contained in paragraphs 1 through 51 hereof as if fully set forth herein.

53. Mr. Antreassian's tour narrative, website, and use of his hearse as a tour vehicle are protected expression under the First Amendment.

54. The Council's denial of Mr. Antreassian's first application for a vehicle for hire license and its continued delay in ruling on his second submission substantially burden Mr. Antreassian's First Amendment right to free expression.

55. Defendant Councilors have clearly indicated that their collective distaste for Mr. Antreassian's hearse, tour narrative, and website motivated their denial of the license.

56. The Council has used its licensing powers under the Salem Code for the single purpose of suppressing Mr. Antreassian's expression.

57. All of the Council's justifications for its denial, as articulated in its official documentation thereof and in individual Councilors' statements at Council meetings and to the press, fall into one of two classes — either content-based or pretextual.

58. The Council has offered no legitimate municipal interest or any other lawful basis to support its content-based objections to Mr. Antreassian's tour.

59. To the extent that Mr. Antreassian has systematically eliminated all grounds for these pretextual objections, he is entitled to a fair, content-neutral evaluation of his vehicle for hire application according to the criteria specified in the ordinance. Under the First Amendment the Council could not raise and cannot continue to raise pretexts to justify its content-based burdening of Mr. Antreassian's business.

60. The Council's actions in violation of Mr. Antreassian's First Amendment rights have damaged him substantially in an amount to be determined by the Court.

## COUNT II

61. Mr. Antreassian repeats and realleges each and every allegation contained in paragraphs 1 through 60 hereof as if fully set forth herein.

62. Mr. Antreassian's tour narrative and use of his hearse are protected expression under the First Amendment.

63. The Council abused its licensing power under § 44-2 of the Salem Code to effect a prior restraint of Mr. Antreassian's expression.

64. The First Amendment required that the Council provide prompt judicial review of its determination.

65. The Council's failure to provide this procedural safeguard and the City's conclusory refusal to acknowledge any constitutional implications of the Council's decision render the licensing process, as applied, an unlawful prior restraint in violation of the First Amendment.

66. This unlawful prior restraint has denied Mr. Antreassian his livelihood and has left him with no immediate alternatives except to terminate his business venture or to litigate his constitutional rights in this court.

## COUNT III

67. Mr. Antreassian repeats and realleges each and every allegation contained in paragraphs 1 through 66 hereof as if fully set forth herein.

68. Mr. Antreassian has a legitimate due process right to swift and fair action on his vehicle for license application. The license is required for his chosen livelihood.

69. Section 44-2 of the Salem Code sets forth the procedural requirements for licensing a "vehicle conveying goods, wares and other articles." The ordinance provides for a routine background check of the proposed driver(s) of the vehicle at issue. The ordinance does not grant broad discretion to Council members to approve or reject license applications according to their pleasure.

70. The Council announced applicant-specific licensing requirements to Mr. Antreassian after he submitted his application, thereby executing a calculated procedural bait-and-switch to frustrate Mr. Antreassian's efforts to conduct his business in Salem.

71. The Council has clearly conducted the licensing process in an arbitrary and capricious manner. Not only did individual Councilors announce extraordinary legal requirements on the fly and without prior notice to Mr. Antreassian, but in most instances the requirements bore no reasonable relationship to the single question pertinent to the

ordinance and before that body — to wit, whether Mr. Antreassian was legally fit to drive passengers around Salem in his state-registered, insured, and licensed tour vehicle.

72.     Moreover, although the Council has demonstrated that it will not be bounded by the textual limits of § 44-2, the City refuses to articulate precisely what its interpretation of the licensing ordinance requires. Mr. Antreassian fears that the Council, endeavoring to justify a second denial of the license, will raise still more phantom requirements for him to meet.

73.     The Council has without explanation delayed its review of Mr. Antreassian's second license submission indefinitely.

74.     The Council's treatment to date of § 44-2 of the Salem Code has egregiously violated Mr. Antreassian's due process rights under the Fourteenth Amendment.

75.     As a result of the Council's failure to provide due process, Mr. Antreassian has been denied his livelihood and has suffered — and continues to suffer — damages in an amount to be determined by the Court.

**WHEREFORE**, plaintiff Douglas Antreassian, d.b.a. Mass. Hysteria Haunted Hearse Tours respectfully requests:

A.      that a declaratory judgment issue finding the Council's management of its licensing procedure under § 44-2 of the Salem Code to be unconstitutional as applied to Mr. Antreassian's license application, pursuant to Counts I, II, and III of this Complaint;

B.   that an injunction issue pursuant to Counts I and III requiring the Council to act on Mr. Antreassian's license application forthwith and solely on the limited criteria of the ordinance;

C.   that judgment for damages be entered for an amount to be determined at trial, pursuant to Counts I, II, and III; and

D.   that judgment for costs and reasonable attorneys' fees be awarded pursuant to Counts I, II, and III.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.**

Dated:      Boston, MA
            July 27, 2000

Douglas Antreassian, d.b.a.
Mass. Hysteria Haunted Hearse Tours
By his attorney,

Edward J. Dailey (BBO # 112220)
Bradley E. Abruzzi, Summer Associate
BROMBERG & SUNSTEIN LLP
125 Summer Street – 11th Floor
Boston, Massachusetts 02110-1618
Tel: (617)443-9292

00001/00001 122243.1